**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ARMSTRONG, Thomas E., AUKEMA, Douglas & Patricia A., BACKUS, Roy R., BARNHART, Jesse & Charity A., BARNEY, Patricia A., BENNETT, Lynn G. & Ruth M., BJORKSTROM, Ellen M., BLAZEY, Paul F. & Patricia A., BROWN, Henry A. & Lois B., BRUNNER, Thomas A., BURCHELL, Anthony & Cynthia, BURCHELL, Gary W., BURCZ, Jerome P., BURCZ, Vincent S., BURGHARDT, Sandra, CASTLINE, Clifford & Alice, CHEESEMAN, Betty A., COOK, Bruce T. & Amy M., COTCAMP, Susan L., COTCAMP, Sarah M., CUMMINGS, Pamela A., DAVIS, Robert L., Jr. & Penny L., DAVIS, Daniel J., DEAN, Brooke B., DORN, William A. & Barbara J., EVANS, Evan Fred & Cynthia, FISHER, Gail P., FISHER, Marvin L., II, as Trustee of the Marvin L. Fisher II Revocable Trust dtd. 9/8/2004, FISHER, Jean G., as Trustee of the Jean G. Fisher Revocable Trust dtd. 9/8/2004, FORD HILL COUNTRY CLUB, INC., FRANKLIN, Neil & Linda, FROST, Larry G. & Mary A., GARDNER, Douglas W. & Joan E., GRAHAM, Norman Bo, GREENE, Douglas, HARTMAN, Shirley A., HELINSKI, Edward F. & Anne E., HENDERSON, Edward Junior, HIBBARD, Herbert A., HIBBARD, Daniel L. & Mary B., HIEMSTRA, August & Leslie J., HRICIK, John P. & Susie A., HRICIK, Stella, HUIZINGA, Henry & Lois J., HURLBUT, Jon L., HUST, Brian J. & Corinne, HUST, William H. & Rowena A., HUST, Earl C. & Sherri M., HUST, Millicent E., IRISH, Steven P. & Eileen A., JAKUBOWSKI, Stefan & Jadwiga, KELLICUTT, Joseph W. & Dorleen, KELLICUTT, Michael J., KOPPEL, Michael J. & Susan, KUZEL, Robert D. & Cheryl A., LASKOWSKI, Frank P. & Victoria E., LASKOWSKI, John Paul & Kimberlee, LEE, Charles W. & Susan F., LEE, Gary A., LEE, Mary S., LILYEA, Gary E. & Mary W., LILYEA, Michael G., LINDOW, Eleanor, MAOLOSSI, Jennifer A., MANWARING, Ronald L. & Sheryl L., MARCOTTE, Andrea, MARKS, Ann M., MASLIN, Eddie W. & Carol M., MAUCERI, Pietro & Guiseppina, MERRILL, Anna Maria, MOUTHAAN, Mary S., MRAS, Charles R., MRAS, Gery J., NIEMANN, Fred W. & Jean E., NIEMANN, William & Darlene, PATRIAS, Terrence K., PENDELL, Joseph F., PENDELL, Orrin G. & Margaret D., PENDELL, Orrin G., PENDELL, Robert D., Jr., PENDELL, Robert D., Sr., PENDELL, Robert D., PENDELL, Roger D., Jr., PROCON CONTRACTING, LLC, RACINE, John & Dawn L., REINKE, Julie M., RUSSIN, Andrew, RUTKOWSKI, Edward & Donna, RYAN, Edward Augustus, IV & Christine Renee, SAUVE, Kenneth R., SCHAEFFER, David W. & Joan P., SCHAFFER, John & Christy, SCHWARTZ, Jerrold P., SHAFER, William, SHAPINAS, Michael J., SMAS, Joan E., SMITH, Mat J., SMITH, Gary L. & Kim, SMITH, Dorothy, SWEENEY, Norman J. & Ruth A.,

**COMPLAINT**
**Civil Case No.:**

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

TACKLEY, Clyde F., TILL-SON FARMS, a New York partnership consisting of TILLOTSON, Douglas, TILLOTSON, Gerald and TILLOTSON, Steven G. & Brenda, TOMPKINS, Harold M. & Nancy J., ULBRIGHT, Daniel B., ULBRIGHT, Rudolph, VAN KUREN, Elane A., WARD, Henry & Annette, WATERMAN, Robert L., Jr., & Sharon L., WEBER, Rosemarie, WHITTAKER REALTY, LLC, WIKTOREK, Robert J. & Kathleen K., WILKIE, Ann K., WOODRUFF, Gary L. & Josephine, YELENCSICS, Tracy L.

Plaintiffs,

VS.

CHESAPEAKE APPALACHIA, LLC and
STATOILHYDRO USA ONSHORE PROPERTIES, INC.

Defendants.

---

**NATURE OF ACTION, PARTIES, JURISDICTION AND VENUE**

1. This is a declaratory judgment action brought pursuant to 28 U.S.C. §2201 to obtain a determination that certain oil and gas leases entered into by plaintiffs and defendant, Chesapeake Appalachia, LLC, or its predecessors and successors in interest, terminated as a matter of law at the conclusion of the primary term of said leases; or, alternatively, in those instances wherein the primary term of the lease has not yet expired, that the primary term thereof has not been extended.

2. Jurisdiction is based on diversity of citizenship of the parties.

3. The citizenship of the plaintiffs herein is reflected on Exhibits "A, "F", "K", "K-1", "O" and "R".

4. The oil and gas leases in question pertain to real property, a substantial portion of which is located within the Northern District of New York.

5. Upon information and belief, defendant Chesapeake Appalachia, LLC ("Chesapeake") is a limited liability company organized and existing under the laws of the State of Oklahoma, with a principal place of business in Oklahoma City, Oklahoma.

6. Upon information and belief, defendant Statoilhydro USA Onshore Properties, Inc. ("Statoil") is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Houston, Texas.

7. Upon information and belief, both Chesapeake and Statoil claim an interest in oil and gas leases encumbering plaintiffs' real property located in the State of New York; thus, jurisdiction is established pursuant to 28 U.S.C. §1391(2).

8. As more fully set forth below, there is at least $75,000 in dispute as to each plaintiff in this litigation. Therefore, jurisdiction is established pursuant to 28 U.S.C.§1332.

## FACTUAL ALLEGATIONS AS TO THE CAP LEASES

9. During the year 2000, those plaintiffs identified on Exhibit "A", or their predecessors in interest (collectively referred to as the "CAP plaintiffs") entered into oil and gas leases with Central Appalachin Petroleum.

10. The leases entered into by the CAP plaintiffs are collectively referred to as the "CAP leases".

11. A copy of each CAP lease is attached hereto as Exhibit "B".

12. Upon information and belief, the consideration paid to the CAP plaintiffs for entering into the CAP leases was $3.00 per acre.

13. The CAP leases were eventually acquired by Chesapeake.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

14. Thereafter, Chesapeake assigned a 32.5% interest in the CAP leases to Statoil and, upon information and belief, as consideration for such assignment, Statoil paid to Chesapeake the sum of $5,800 per acre, which equates to a market value of $17,400 per acre.

15. The CAP leases provide for a ten (10) year primary term, which has now expired.

16. In accordance with New York General Obligations Law §15-304, defendants were required to provide to the CAP plaintiffs a release from the leases within thirty (30) days of the termination of each lease.

17. Defendants have failed to tender releases to the CAP plaintiffs in accordance with §15-304 of the General Obligations Law.

18. The pertinent portion of the "Leasing Clause" provision contained in the CAP leases, which clause describes what has been leased by the landowner, provides that the "Lessor hereby leases exclusively to Lessee all the oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased ..." (hereinafter referred to as the "Leasing Clause").

19. The pertinent portion of the "Lease Term" clause contained in the CAP leases, also known as the "habendum clause", provides that the lease continues through the primary term "and for so long thereafter as prescribed payments are made, or for as long thereafter as operations are conducted on the Leasehold in search of or production of oil, gas or their constituents or for as long as a well capable of production is located on the Leasehold, or for as long as extended by provision herein, or for as long as the Leasehold is used for the underground storage of gas, or for the protection of stored gas." (hereinafter referred to as the "Lease Term clause").

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

20. No operations have been conducted upon any of the real property subject to the CAP leases.

21. No wells have been drilled on any of the real property subject to the CAP leases.

22. None of the real property subject to the CAP leases has been used for the storage of gas.

23. None of the real property subject to the CAP leases has been used for the protection of stored gas.

24. No oil and gas has been produced by the defendants from any of the real property subject to the CAP leases.

25. None of the CAP plaintiffs has received royalty payments.

26. Upon information and belief, shortly prior to, or following the expiration of their leases, the CAP plaintiffs received a letter from Chesapeake, in the form attached hereto as Exhibit "C", advising that their leases had been extended by reason of payment and "force majeure" (the "CAP Extension Letter").

27. In certain instances, the CAP Extension Letter was accompanied by a payment in the amount of $3.00 per acre multiplied by the leased acreage.

28. The CAP plaintiffs uniformly rejected the tender of the payment, if any, that accompanied the CAP Extension Letter.

29. In certain instances, Chesapeake filed a notice and affidavit of extension in the office of the Clerk of the County wherein the subject real property was located claiming that "prescribed payments" and force majeure extended the lease . A copy of a form notice and affidavit of extension is attached hereto as Exhibit "D".

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

**As to the "Payments" and "Prescribed Payments" Claimed Extension of the CAP Leases**

30. The CAP Extension Letter cites to the Lease Term, as well as the Delay Rental and Delay in Marketing clauses in the leases, claiming that payments made pursuant to those clauses extended the lease.

31. The portion of the Lease Term clause contained in the CAP leases, upon which clause Chesapeake apparently relies, provides, in pertinent part, that the lease continues through the primary term "and for so long thereafter as prescribed payments are made..."

32. The term "prescribed payments" is undefined in the CAP leases.

33. The Delay Rental clause contained in the CAP leases provides that the Lessor covenants to pay Delay Rental "at the rate of Three ($3.00) dollars per net mineral acre payable quarterly, in advance, ..... and continuing thereafter until the commencement of Royalty payments. Delay Rental paid for time beyond the commencement date of Royalty payments shall be credited upon the Royalty payment. Upon Conversion to Storage, Delay Rental payments shall be reestablished."

34. The Delay in Marketing Clause contained in the CAP leases provides that "[i]n the event that Lessee does not market producible gas, oil or their constituents from the Leasehold, Lessee shall continue to pay Delay Rental until such time as marketing is established, and such payment shall maintain this lease in full force and effect to the same extent as payment of Royalty."

35. Chesapeake claims that payment of a nominal $3.00 per acre maintains the CAP leases in force past their primary term, in perpetuity, and at the sole discretion of Chesapeake.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

36. Chesapeake's position that the Delay Rental and Delay in Marketing Clauses extend the CAP leases is in stark contrast to the language of the lease and would render the clearly finite primary term meaningless, and also is in derogation of well established law applicable to oil and gas leases.

37. Neither the Delay Rental nor Delay in Marketing Clauses can properly serve to extend the CAP leases past their primary term.

38. The well established meaning of a delay rental payment in such leases is that it is a payment made during the primary term of a lease as the consideration paid by a Lessee for its failure to develop the mineral estate.

39. Payment of delay rental, following expiration of the primary term of the CAP leases, standing alone and in the absence of any operations on the leased premises, cannot properly serve to extend the lease.

40. In this instance, there have been no operations upon the leased premises.

41. The Delay in Marketing clause is premised upon the existence of a well capable of production.

42. No wells have been drilled upon the leased premises.

43. Thus, neither the Delay Rental nor Delay in Marketing Clauses can properly serve to extend the primary term of the CAP leases.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

## As to the "Force Majeure" Claimed Extension of the CAP Leases

44. The CAP Extension Letter cites to the "Covenants Clause" contained in the CAP leases and a directive of then Governor Paterson, dated July 23, 2008, as the basis for the "force majeure" extension.

45. The CAP leases do not contain a force majeure clause.

46. The "Covenants Clause" contained in the CAP leases provides that "[t]his lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is prevented by federal, state, or local law, regulation or decree."

47. The "Covenants Clause" contained in the CAP leases applies exclusively to "expressed or implied covenants" of the lease.

48. The Lease Term clause, which sets forth the duration of the CAP leases and the manner in which the primary term of said leases may be extended, is not an expressed or implied covenant.

49. Rather, occurrence of one of the events enumerated in the Leasing Clause is a condition precedent to enlargement of the primary term of the CAP leases.

50. As the Lease Term clause contained in the CAP leases does not include a provision excusing failure of a condition precedent, the "Covenants Clause" cannot serve to extend the primary term of said leases.

51. Additionally, the "Covenants Clause" contained in the CAP leases does not provide for extension of the primary term in the event of an occurrence of one of the enumerated events.

52. Thus, the "Covenants Clause" contained in the CAP leases cannot serve to extend the primary term of said leases.

53. In the CAP Extension Letter, Chesapeake advised the CAP plaintiffs that Governor Paterson's directive constituted "a de facto moratorium on the processing of all permit applications for Marcellus wells ..." and that this directive "constitutes a state regulation or decree preventing Chesapeake from conducting further operations in pursuit of Marcellus well development (hereinafter a "force majeure event")."

54. A copy of the Governor's directive is attached hereto as Exhibit "E".

55. This directive required the Department of Environmental Conservation to update the Department's generic environmental impact statement pertaining to oil and gas drilling.

56. There is nothing contained in the directive that imposes a ban on the issuance of permits for any natural gas drilling project, including projects targeting the Marcellus shale formation.

57. Rather, the Department of Environmental Conservation website states that "any entity that applies for a drilling permit for horizontal drilling in the Marcellus Shale and opts to proceed with its permit application will be required to undertake an individual, site-specific environmental review."

58. Defendants were at liberty to proceed with a permit application for horizontal drilling, if defendants were willing to undertake a site specific environmental review.

59. Upon information and belief, no such permit application was made by defendants within the primary term of the leases.

60. Moreover, the Leasing Clause of the CAP lease does not limit defendants to any particular formation, or any particular method of drilling.

61. The real property subject to defendants' leases is located in Broome, Tioga, Chemung and Yates counties.

62. There are several geologic formations which underlie these counties, apart from the Marcellus shale formation, which could be developed and drilled by defendants.

63. Dozens of permits have been issued in New York State since July 23, 2008, in various formations, including some in the Marcellus shale.

64. Defendants were free under the subject leases to develop these other geological formations.

65. Additionally, defendants were free to utilize technologies other than horizontal drilling and high volume hydraulic fracturing to develop the leased premises.

66. Oil and gas operators have successfully developed shale formations implementing horizontal drilling with liquified petroleum gas, such procedure is known as a "gas frac".

67. Additionally, defendants were at liberty to drill without the use of high volume hydraulic fracturing.

68. Defendants' claimed inability to obtain a permit to drill in a particular manner and in a specific formation, when they have made no efforts to overcome such claimed inability by preparation of a site specific environmental impact statement, or by utilizing different available technologies and processes, does not constitute a force majeure event.

**FIRST CLAIM FOR RELIEF**

69. As a result of defendants' actions, and defendants' failure to tender releases of the oil and gas leases at the expiration of the primary term to the CAP plaintiffs, defendants have created a cloud on the title of the subject mineral estates, rendering the CAP plaintiffs unable to market their minerals and oil

and gas interests.

70. Accordingly, the CAP plaintiffs request, pursuant to 28 U.S.C. §2201, that this Court declare the rights of the parties herein and, specifically, that this Court declare that the CAP leases have expired and direct defendants to file a release of each lease.

## FACTUAL ALLEGATIONS AS TO THE COLUMBIA LEASES

71. During the years 2004 through 2006, those plaintiffs identified on Exhibit "F", or their predecessors in interest (collectivelyreferred to as the "COLUMBIA plaintiffs") entered into oil and gas leases with Columbia Natural Resources, LLC.

72. The leases entered into by the COLUMBIA plaintiffs are collectively referred to as the "COLUMBIA leases".

73. A copy of each COLUMBIA lease is attached hereto as Exhibit "G".

74. The COLUMBIA leases were thereafter acquired by Chesapeake.

75. Upon information and belief, the consideration paid to the COLUMBIA plaintiffs for entering into the COLUMBIA leases was the sum of $5.00 per acre.

76. The COLUMBIA leases provide for a five (5) year primary term, which has now expired.

77. In accordance with New York General Obligations Law §15-304, defendants were required to provide to the COLUMBIA plaintiffs releases from the leases within thirty (30) days of termination of the leases.

78. Defendants have failed to tender releases to the COLUMBIA plaintiffs in accordance with §15-304 of the General Obligations Law.

79. Upon information and belief, Chesapeake assigned a 32.5% interest in and to the

COLUMBIA leases to Statoil.

80. Upon information and belief, as consideration for such assignment of an interest in the COLUMBIA leases, Statoil paid to Chesapeake the sum of $5,800 per acre, which equates to a market value of $17,400 per acre.

81. The pertinent portions of the Leasing Clause contained in both the CAP and COLUMBIA leases are identical.

82. The pertinent portions of the Lease Term clause contained in both the CAP and COLUMBIA leases are identical.

83. Except as noted below, no operations have been conducted upon any of the real property subject to the COLUMBIA leases.

84. Except as noted below, no wells have been drilled on any of the real property subject to the COLUMBIA leases.

85. Except as noted below, none of the real property subject to the COLUMBIA leases has been used for the storage of gas.

86. Except as noted below, none of the real property subject to the COLUMBIA leases has been used for the protection of stored gas.

87. Except as noted below, no oil and gas has been produced from any of the real property subject to the COLUMBIA leases.

88. Except as noted below, none of the COLUMBIA plaintiffs has received royalty payments.

89. Plaintiffs Marvin Fisher, III, as Trustee of the Marvin L. Fisher Revocable Trust and Jean G. Fisher as Trustee of the Jean G. Fisher Revocable Trust are two of the COLUMBIA plaintiffs (hereinafter the "Fisher plaintiffs").

90. Approximately 80.26 acres of the lease holdings of the Fisher plaintiffs were unitized, and

in 2007, a well named the Salo 1 well was drilled.

91. The Salo 1well has since been abandoned.

92. Defendants have failed to provide the Fisher plaintiffs a release of said lease in accordance with General Obligations Law §15-304.

93. Upon information and belief, shortly prior to, or following the expiration of their leases, the COLUMBIA plaintiffs received a letter from Chesapeake, in the form attached hereto as Exhibit "H", advising that their leases had been extended by reason of the "Covenants Clause" and "force majeure"(the "First Columbia Extension Letter").

94. The COLUMBIA leases do not contain a force majeure clause.

95. The "Covenants Clause" contained in the COLUMBIA leases is identical to that contained in the CAP leases.

96. The force majeure claim asserted in the First Columbia Extension Letter is identical to that asserted by Chesapeake in its correspondence with the CAP plaintiffs; namely, that there was a "de facto" moratorium on Marcellus well development.

97. Upon information and belief, thereafter, and in the year 2010, a second letter was sent to the COLUMBIA plaintiffs, in the form attached hereto as Exhibit "I" (the "Second Columbia Extension Letter").

98. The Second Columbia Extension Letter claimed that, in addition to force majeure, the COLUMBIA leases were extended by the making of prescribed payments.

99. The Second Columbia Extension Letter enclosed payments purportedly representing delay rental for the prior year, as well as the current year.

100. Upon information and belief, defendants failed to timely tender delay rental payments to the COLUMBIA plaintiffs.

101. Such failure to pay delay rental during the primary term serves to automatically terminate the COLUMBIA leases.

102. The COLUMBIA plaintiffs uniformly rejected the tender of the delay rental payment, if any, that accompanied the second letter.

103. In certain instances, Chesapeake filed a notice and affidavit of extension in the office of the Clerk of the County wherein the subject real property was located claiming that "prescribed payments" and force majeure extended the lease . A copy of a form notice and affidavit of extension is attached hereto as Exhibit "J".

104. The Second Columbia Extension Letter cites to the Lease Term, as well as the Delay Rental and Delay in Marketing clauses, all of which are identical to such clauses in the CAP leases, claiming that payments made pursuant to these clauses extended the lease.

105. For the reasons more fully set forth in paragraphs "30" through "68", defendants are unable to extend the COLUMBIA leases.

## SECOND CLAIM FOR RELIEF

106. As a result of defendants' actions, and defendants' failure to tender releases of the oil and gas leases to the COLUMBIA plaintiffs after the expiration of the primary term, defendants have created a cloud on the title of the subject mineral estates, rendering the COLUMBIA plaintiffs unable to market their minerals and oil and gas interests.

107. Accordingly, the COLUMBIA plaintiffs request, pursuant to 28 U.S.C. §2201, that this Court declare the rights of the parties herein and, specifically, that this Court declare that the COLUMBIA leases expired and direct defendants to file a release of each lease.

## FACTUAL ALLEGATIONS AS TO THE PHILLIPS LEASES

108. During the year 2000, those plaintiffs identified on Exhibit "K", or their predecessors in interest entered into oil and gas leases with Phillips Production Company.

109. The primary term set forth therein was ten (10) years, which has now expired.

110. In accordance with New York General Obligations Law §15-304, defendants were required to provide to the PHILLIPS plaintiffs releases from the leases within thirty (30) days of the termination of the leases.

111. Defendants have failed to tender releases to the PHILLIPS plaintiffs in accordance with §15-304 of the General Obligations Law.

112. During the period 2004 through 2006, those plaintiffs identified on Exhibit "K-1" entered into oil and gas leases with Phillips Production Company.

113. The primary term set forth therein was five (5) years, and the primary terms of certain of those leases have now expired or are due to expire shortly.

114. The plaintiffs identified in paragraph "108 " and "112" above, are herein collectively referred to as the PHILLIPS plaintiffs.

115. The leases entered into by the PHILLIPS plaintiffs are collectively referred to as the "PHILLIPS leases".

116. A copy of each PHILLIPS lease is attached hereto as Exhibit "L".

117. Upon information and belief, the consideration paid to the PHILLIPS plaintiffs for entering into the PHILLIPS leases was the sum of $5.00 per acre.

118. The PHILLIPS leases were thereafter acquired by Chesapeake.

119. Upon information and belief, Chesapeake assigned a 32.5% interest in and to the

PHILLIPS leases to Statoil.

120. Upon information and belief, as consideration for such assignment of an interest in the PHILLIPS leases, Statoil paid to Chesapeake the sum of $5,800 per acre, which equates to a market value of $17,400 per acre.

121. Upon information and belief, shortly prior to, or following the expiration of their leases, all PHILLIPS plaintiffs received a letter from Chesapeake, in the form attached hereto as Exhibit "M", advising that their leases had been extended by reason of the "Force Majeure" and "general covenants clauses " contained in the PHILLIPS leases (the PHILLIPS Extension Letter").

122. The Phillips Extension Letter again referred to Governor Patterson's directive of July 23, 2008, and claimed that this directive constituted a "de facto moratorium" on the processing of permit applications for Marcellus shale wells.

123. The "general covenants clause", though not denominated as such in the PHILLIPS leases, provides that "[a]ll expressed or implied covenants of this lease shall be subject to all Federal and State laws, executive orders, rules or regulations, and ths lease shall not be terminated in whole or in part, nor shall lessee be held liable in damages, for failure to comply therewith if compliance is prevented by, or if such failure is the result of any such law, order, rule or regulation."

124. In certain instances, Chesapeake filed a notice and affidavit of extension in the office of the Clerk of the County wherein the subject real property was located claiming that "prescribed payments" and "force majeure" extended the leases. A copy of a form notice and affidavit of extension is attached hereto as Exhibit "N".

125. The phrase "prescribed payments" does not appear in the PHILLIPS leases.

126. The PHILLIPS leases do not contain any language permitting the leases to be extended by reason of prescribed payments.

127. The PHILLIPS leases describe the purpose and term of the leases, in pertinent part, as follows: "that the Lessee leases the premises for the sole and only purpose of testing, drilling and operating for oil and gas and of storing in any underlying strata therein by any means and withdrawing therefrom by any means oil or gas produced from the same or other lands, with the exclusive right to operate the same for the term of ___ years, and as long thereafter as oil or gas is produced, stored in, or withdrawn therefrom by any means, or operations for oil or gas of the storage thereof are being conducted ... or at any time thereafter oil or gas is being produced, stored in, or withdrawn therefrom or operations are being conducted thereon for aid purposes and to complete the same ...."

128. There has been no oil and gas produced from the premises leased by the PHILLIPS plaintiffs.

129. No gas has been stored upon the premises leased by the PHILLIPS plaintiffs.

130. No gas has been withdrawn from the premises leased by the PHILLIPS plaintiffs.

131. No operations have been conducted upon the premises leased by the PHILLIPS plaintiffs.

132. None of the PHILLIPS plaintiffs has received royalty payments.

133. The PHILLIPS leases contain a Delay Rental Clause which provides, in pertinent part, that "this Lease shall become null and void and all rights hereunder shall cease and determine, unless operations for the drilling of a well on said premises for oil or gas, the storage of gas, or as provided in above Unitization Clause, are commenced within forty-five (45) days from the date hereof, or unless said lessee shall pay _______ dollars ($ ____) every year in advance for each additional year the commencement of such operations is delayed from the time above mentioned for the commencement of operations, until operations are commenced, or unless storage rentals or storage well rentals, as hereinafter provided are paid".

134. The Unitization Clause referenced in the Delay Rental Clause provides, in pertinent part,

that the "Lessee is granted the right to pool and unitize the Onondaga, Oriskany or deeper formations under all or any part of the [leased land] with any other lease or leases ... so as to create one or more drilling or production units.

135. The Marcellus shale formation sits above the Onondaga and Oriskany formations.

136. Thus, the PHILLIPS leases do not give to defendants the right to pool the leaseholds of the PHILLIPS plaintiffs in order to develop the Marcellus shale formation.

137. For the reasons more fully set forth in paragraphs "30" through "68", defendants are unable to extend the PHILLIPS leases.

## THIRD CLAIM FOR RELIEF

138. Accordingly, the PHILLIPS plaintiffs request, pursuant to 28 U.S.C. §2201, that this Court declare the rights of the parties herein and, specifically, that this Court declare that as to those PHILLIPS plaintiffs set forth on Exhibits "K" and "K-1", that their leases expired at the conclusion of the primary term and direct defendants to file a release of each such lease, and as to those PHILLIPS leases which have not yet expired, if any, that said leases have not been extended.

## FACTUAL ALLEGATIONS AS TO THE CHESAPEAKE LEASES

139. Between the period of 2006 to 2007, those plaintiffs identified on Exhibit "O, or their predecessors in interest (collectively referred to as the "CHESAPEAKE plaintiffs") entered into oil and gas leases with Chesapeake Appalachia, LLC.

140. The leases entered into by the CHESAPEAKE plaintiffs are collectively referred to as the

"CHESAPEAKE leases".

141. A copy of each CHESAPEAKE lease is attached hereto as Exhibit "P".

142. Upon information and belief, the consideration paid to the CHESAPEAKE plaintiffs for entering into the CHESAPEAKE leases was the sum of $5.00 per acre.

143. The CHESAPEAKE leases provide for a five (5) year primary term.

144. Certain of the CHESAPEAKE leases have expired, while others will expire within a year's time.

145. As to those CHESAPEAKE leases which expired, defendants were required to provide to the CHESAPEAKE plaintiffs releases from the leases within thirty (30) days of the termination of the leases, in accordance with New York General Obligations Law §15-304.

146. Defendants have failed to tender releases to the CHESAPEAKE plaintiffs as to the expired leases in accordance with §15-304 of the General Obligations Law.

147. Upon information and belief, Chesapeake assigned a 32.5% interest in and to certain CHESAPEAKE leases to Statoil.

148. Upon information and belief, as consideration for such assignment of an interest in the CHESAPEAKE leases, Statoil paid to Chesapeake the sum of $5,800 per acre, which equates to a market value of $17,400 per acre.

149. The pertinent portions of the Leasing Clause contained in the CHESAPEAKE leases are identical to that same clause in the CAP and COLUMBIA leases.

150. The pertinent portions of the Lease Term clauses contained in the CHESAPEAKE leases are identical to that same clause in the CAP and COLUMBIA leases.

151. No operations have been conducted upon any of the real property subject to the CHESAPEAKE leases.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

152. No wells have been drilled on any of the real property subject to the CHESAPEAKE leases.

153. None of the real property subject to the CHESAPEAKE leases has been used for the storage of gas.

154. None of the real property subject to the CHESAPEAKE leases has been used for the protection of stored gas.

155. No oil and gas has been produced from any of the real property subject to the CHESAPEAKE leases.

156. None of the CHESAPEAKE plaintiffs have received royalty payments.

157. Upon information and belief, the CHESAPEAKE plaintiffs received a letter from Chesapeake, in the form attached hereto as Exhibit "Q", advising that their leases had been extended by reason of payment, "force majeure" and the "Covenants Clause" contained in the CHESAPEAKE lease.

158. The CHESAPEAKE leases do not contain a force majeure clause.

159. The "Covenants Clause" contained in the CHESAPEAKE leases is identical to that same clause contained in the CAP and COLUMBIA leases.

160. The force majeure claim asserted in the CHESAPEAKE Extension Letter was identical to that asserted by Chesapeake in its correspondence with the CAP, COLUMBIA and PHILLIPS plaintiffs, with the exception of including reference to Executive Order No.41 issued on December 13, 2010.

161. For the reasons more fully set forth in paragraphs "30" through "68", defendants are unable to extend the CHESAPEAKE leases.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

## FOURTH CLAIM FOR RELIEF

162. Accordingly, the CHESAPEAKE plaintiffs request, pursuant to 28 U.S.C. §2201, that this Court declare the rights of the parties herein and, specifically, that this Court declare, as to those CHESAPEAKE leases which have reached the end of their primary term, that said leases have expired and direct defendants to file release of each such lease, and as to those CHESAPEAKE leases which have not yet expired, if any, that said leases have not been extended..

## FACTUAL ALLEGATIONS AS TO THE FORTUNA LEASE

163. In 2006, the plaintiff identified on Exhibit "R" (referred to as the "FORTUNA plaintiff") entered into an oil and gas lease with Fortuna Energy Inc.

164. The lease entered into by the FORTUNA plaintiff is referred to as the "FORTUNA lease".

165. A copy of the FORTUNA lease is attached hereto as Exhibit "S".

166. The consideration paid to the FORTUNA plaintiff for entering into the FORTUNA lease was the sum of $5.00 per acre.

167. The FORTUNA lease provides for a five (5) year primary term, which has now expired.

168. Defendants were required to provide to the FORTUNA plaintiff a release from the lease within thirty (30) days of the termination of the lease.

169. Defendants failed to tender a release to the FORTUNA plaintiff.

170. The FORTUNA lease was acquired by Chesapeake.

171. Upon information and belief, Chesapeake assigned a 32.5% interest in the FORTUNA

lease to Statoil.

172. Upon information and belief, as consideration for such assignment of an interest in the FORTUNA lease, Statoil paid to Chesapeake the sum of $5,800 per acre, which equates to a market value of $17,400 per acre.

173. The pertinent portion of the Leasing Clause contained in the FORTUNA lease provides that "[l]essor hereby grants and leases exclusively to Lessee all oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the Leasehold, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure and market production form the Leasehold, using methods and techniques which are not restricted to current technology, including the exclusive right to conduct geophysical and other exploratory tests ..."

174. The pertinent portion of the Lease Term clause contained in the FORTUNA lease provides that the lease shall "remain in force for a primary term of Five (5) Years from ___ (the "Primary Term"), and for so long thereafter as any of the following occur: (i) a well capable of producing oil and/or gas is located on the lands pooled, unitized or combined with all or a portion of the Leasehold: (ii) Lessor is receiving Royalty payments or Shut-In Royalty payments ... or (iii) Operations, as hereinafter defined, are being conducted on lands pooled, unitized or combined with all or a portion of the Leasehold ... provided that such Operations result in a well capable of producing oil and/or gas ..."

175. The FORTUNA leasehold has not been pooled or unitized.

176. No oil or gas wells are located upon the real property subject to the FORTUNA lease.

177. The FORTUNA plaintiff has not received royalty or shut-in payments.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

178. No operations have been conducted upon any of the real property subject to the FORTUNA lease.

179. The FORTUNA plaintiff received a letter from Chesapeake, a copy of which is attached hereto as Exhibit "T", advising that the lease had been extended by reason of a "force majeure" clause contained in the FORTUNA lease (the "FORTUNA Extension Letter").

180. The force majeure claim asserted in the FORTUNA Extension Letter was virtually identical to that asserted by Chesapeake in its correspondence with the CAP, COLUMBIA and PHILLIPS plaintiffs, namely, that there was a "de facto" moratorium on Marcellus shale well development.

181. The force majeure clause contained in the FORTUNA lease provides, in pertinent part, that "[l]essee's obligations under this Lease shall be suspended if compliance is prevented by any federal, state, or local law, regulation or decree ... or other conditions or circumstances reasonably beyond the control of Lessee, ... for so long as compliance is thus prevented and for six (6) months thereafter".

182. For the reasons more fully set forth in paragraphs "44" through "68", defendants are unable to extend the FORTUNA lease.

**FIFTH CLAIM FOR RELIEF**

183. Accordingly, the FORTUNA plaintiff requests, pursuant to 28 U.S.C. §2201, that this Court declare the rights of the parties herein and, specifically, that this Court declare that the FORTUNA lease expired and direct defendants to file a release of the lease.

## FACTUAL ALLEGATIONS AS TO VIOLATION OF GENERAL BUSINESS LAW §349

184. Beginning in and around 2008, and continuing through to the present, defendants have engaged in misleading and deceptive practices directed at hundreds, if not thousands, of persons owning real property in the State of New York, including the plaintiffs herein.

185. These misleading and deceptive practices include, but are not limited to, the following: (a) authoring and directing correspondence to plaintiffs falsely representing to plaintiffs that their leases had been extended by virtue of force majeure, wherein the vast majority of the plaintiffs' leases did not contain a force majeure clause; (b) authoring and directing correspondence to plaintiffs advising plaintiffs that a force majeure event occurred, when such representation was knowingly false; (c) authoring and directing correspondence to plaintiffs falsely representing that defendants were unable to develop the plaintiffs' leaseholds when, in fact, permits to drill for natural gas were being issued in the State of New York; (d) authoring and directing correspondence to plaintiffs falsely representing to plaintiffs that a Delay in Marketing Clause served to extend plaintiffs' leases when defendants, in fact, failed to produce any gas from plaintiffs' leaseholds that could have been marketed; (e) subscribing and filing affidavits in the Office of the County Clerk falsely representing that the PHILLIPS leases were extended by virtue of "prescribed payments" when, in fact, the term "prescribed payments" is not contained in the PHILLIPS leases and (f)subscribing and filing affidavits in the Office of the County Clerk falsely representing that the plaintiffs' leases were extended by virtue of force majeure when, in fact, no force majeure event had occurred.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

186. As a result of such misleading and deceptive practices of defendants, plaintiffs have been unable to sell, mortgage or refinance their properties, and have been prevented from marketing their minerals and real property to third parties for fair market value.

187. The misleading and deceptive practices of the defendants constitute a willful violation of §349(h) of the General Business Law of the State of New York, entitling plaintiffs to treble damages.

188. Defendants are liable to plaintiffs for compensatory damages, treble damages and reasonable attorneys as provided for in §349 of the General Business Law of the State of New York.

## SIXTH CLAIM FOR RELIEF

189. Accordingly, plaintiffs request that this Court award plaintiffs compensatory and treble damages, together with reasonable attorneys' fees, costs and disbursements associated with this action.

## DECLARATORY RELIEF IS APPROPRIATE

190. For the reasons stated above, there exists an actual controversy between plaintiffs and all of the defendants within the jurisdiction of this Court and involving the rights and liabilities of the parties under the lease agreements discussed above, which controversies may be determined by a judgment of this Court without other suits.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request as to Plaintiffs' FIRST through SIXTH Claims for Relief, that:

1. This Court render a declaratory judgment, as to those leases which have reached the end of their primary terms and/or expired, that all such leases are terminated and directing defendants to file a release of each such lease;

2. This Court render a declaratory judgment, as to those leases which have not yet reached the end of their primary terms, that all such leases have not been extended;

3. Plaintiffs be awarded compensatory and treble damages;

4. Plaintiffs be awarded reasonable attorney's fees, costs and disbursements associated with this action; and

5. This Court grant Plaintiffs such other and further relief as to which they may be entitled.

LEVENE, GOULDIN & THOMPSON, LLP
P.O.BOX F-1706
BINGHAMTON, NY 13902-0106

**JURY TRIAL DEMAND**

**PLEASE TAKE NOTICE** that plaintiffs demand a jury determination of all issues so triable.

Dated: April 28, 2011

LEVENE, GOULDIN & THOMPSON, LLP

Cynthia Manchester

Cynthia Ann K. Manchester, Esq.
Bar Roll No: 301273
Attorneys for Plaintiffs
450 Plaza Drive
Vestal, New York 13850
Telephone: (607)763-9200
e-mail Address: cmanchester@binghamtonlaw.com

Scott R. Kurkoski

Scott R. Kurkoski, Esq.
Bar Roll No: 501006
Attorneys for Plaintiffs
450 Plaza Drive
Vestal, New York 13850
Telephone: (607)763-9200
e-mail address: skurkoski@binghamtonlaw.com