UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DOUGLAS AUKEMA; PATRICIA A. AUKEMA;
JESSE BARNHART; CHARITY A. BARNHART;
SCOTT H. BODINE; CONNIE M. BODINE;
ANTHONY BURCHELL; CYNTHIA BURCHELL;
GARY W. BURCHELL; CLIFFORD CASTLINE;
ALICE CASTLINE; BRUCE T. COOK; AMY M.
COOK; GAIL P. FISHER; DOUGLAS GREENE;
HERBERT A. HIBBARD; DANIEL L. HIBBARD;
MARY B. HIBBARD; AUGUST HIEMSTRA;
LESLIE J. HIEMSTRA; JOHN P. HRICIK; SUSIE
A. HRICIK; STELLA HRICIK; STEFAN
JAKUBOWSKI; JADWIGA JAKUBOWSKI;
JAMES P. KEESLER; ELIZABETH F. KEESLER;
JOSEPH W. KELLICUTT; DORLEEN
KELLICUTT; MICHAEL J. KELLICUTT; SUSAN
KELLICUTT; ROBERT D. KUZEL; CHERYL A.
KUZEL; CHARLES W. LEE; SUSAN F. LEE;
GARY A., LEE; MARY S. LEE; EDDIE W.
MASLIN; CAROL M. MASLIN; PIETRO
MAUCERI; GUISEPPINA MAUCERI; JARRETT
D. NEWBY; NANCYJ. NEWBY; ORRIN G.
PENDELL; EDWARD RUTKOWSKI; DONNA
RUTKOWSKI; DAVID W. SCHAEFFER; JOAN
P. SCHAEFFER; GARY L. SMITH; KIM SMITH;
DOROTHY SMITH; NORMAN J. SWEENEY;
RUTH A. SWEENEY; DANIEL J. WILLIAMS;
CHARITY J. WILLIAMS,

                            Plaintiffs,

        -v-                                     3:11–CV–00489

CHESAPEAKE APPALACHIA, LLC and
STATOILHYDRO USA ONSHORE
PROPERTIES, INC.,

                            Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                              OF COUNSEL:

LEVENE GOULDIN & THOMPSON, LLP            CYNTHIA ANN MANCHESTER, ESQ.
Attorneys for Plaintiffs
P.O. Box F-1706
Binghamton, NY 13902

450 Plaza Drive                           MARIA E. LISI-MURRAY, ESQ.
Vestal, NY 13850                          SCOTT R. KURKOSKI, ESQ.

THE WEST FIRM, LLP                        THOMAS S. WEST, ESQ.
Attorneys for Defendant Chesapeake
    Appalachia, LLC
677 Broadway
8th Floor
Albany, NY 12207

FULBRIGHT & JAWORSKI L.L.P.               DAVID L. BARRACK, ESQ.
Attorneys for Defendant Statoilhydro      JEREMY A. MERCER, ESQ.
    USA Onshore Properties, Inc.          MARK A. ROBERTSON, ESQ.
370 Southpointe Boulevard, Suite 300      L. POE LEGGETTE, ESQ.
Canonsburg, PA 15317

DAVID N. HURD
United States District Judge

## MEMORANDUM-DECISION and ORDER

## I. INTRODUCTION

Plaintiffs Douglas and Patricia A. Aukema and other landowners[1] (collectively

"plaintiffs") brought this declaratory judgment action against Chesapeake Appalachia, LLC

("Chesapeake") and Statoilhydro USA Onshore Properties, Inc. ("Statoil") (collectively

"defendants") seeking a declaration that certain oil and gas leases entered into between the

parties expired at the conclusion of the primary terms of those leases and that the terms

---

[1] There are fifty five named plaintiffs in this action, many of whom are husband and wife.  For brevity, all fifty five plaintiffs named in the caption will not be repeated here.

have not been extended by payment or force majeure.[2]  See Am. Compl..  Plaintiffs also

charge defendants with violating New York General Business Law section 349.  Id.

Defendants assert counterclaims seeking a declaration that the leases were extended due to

force majeure events and the tender of payments.

Plaintiffs moved for partial summary judgment declaring that the leases have expired

and directing defendants to file a release of the leases in accordance with New York General

Obligations Law section 15–304.  Defendants opposed plaintiffs' motion and cross-moved for

summary judgment declaring that the leases were extended and are in full force and effect,

and dismissing plaintiffs' amended complaint.  Plaintiffs opposed defendants' motion and

replied in support of their motion.  Defendants replied in support of their motion.

Defendants also moved to strike the reply affidavit of plaintiff's expert David W. Keefe,

dated August 16, 2012.  Plaintiffs opposed.

Oral argument was heard on August 30, 2012, in Utica, New York.  Decision was

reserved.

## II.  BACKGROUND

### A.  Oil and Gas Industry in New York State

Gas drilling in New York State is governed by the Environmental Conservation Law.

Under the authority of that statute, the State Environmental Quality Review Act ("SEQRA"),

N.Y. Envtl. Conserv. Law section 8–0101, was passed "to inject environmental

considerations directly into governmental decision making."  City Council of Watervliet v.

---

[2]  The amended complaint also requests a declaratory judgment, "as to those leases which have not yet reached the end of their primary terms, that all such leases have not been extended to the present date." Am. Compl. at 23.  At the time the amended complaint was filed on September 2, 2011, only one lease had not yet reached the expiration of its primary term—a lease entered into by plaintiffs Joseph W. and Dorleen Kellicutt.  Absent extension, that lease expired on September 5, 2011.  Therefore this request is now moot.

Town Bd. of Colonie, 3 N.Y.3d 508, 515, 822 N.E.2d 339, 341 (2004) (internal quotations omitted).

SEQRA requires all New York State agencies, including the New York State Department of Environmental Conservation ("DEC"), to prepare or cause to be prepared an Environmental Impact Statement ("EIS") for "any action . . . which may have a significant effect on the environment."  N.Y. Envtl. Conserv. Law § 8–0109(2).[3]  Where the impacts from separate actions are common and predictable, a generic EIS ("GEIS") may be prepared to analyze the impact of all such actions generally and cumulatively instead of preparing an individual (or site-specific) EIS for each action.  See N.Y. Comp. Codes R. & Regs tit. 6, § 617.10(a).  The purpose of a GEIS is to provide a comprehensive review of the potential environmental impacts of an activity and how those impacts could be mitigated.  Subsequent proposed actions which may significantly affect the environment, but which are not adequately addressed by a GEIS, require either a supplemental GEIS ("SGEIS") or a site-specific EIS.  See id. § 617.10(d)(4); N.Y. Envtl. Conserv. Law § 8–0109(2).

In 1992, the DEC issued a GEIS addressing the environmental impacts associated with oil and gas exploration.  N.Y.S. Dep't of Envtl. Conservation, Generic Envtl. Impact Statement on Oil, Gas, and Solution Mining Regulatory Program (1992), available at http://www.dec.ny.gov/energy/45912.html.  The 1992 GEIS contemplated conventional well fracturing using 20,000 to 80,000 gallons of fluid.

---

[3]  The EIS must include, among other things, "(a) a description of the proposed action and its environmental setting; (b) the environmental impact of the proposed action including short-term and long-term effects; (c) any adverse environmental effects which cannot be avoided should the proposal be implemented; [and] (d) alternatives to the proposed action[.]"  Id. § 8–0109(2)(a)-(d).

During 2008 there was an increased interest in the issuance of permits for horizontal drilling[4] and high volume hydraulic fracturing ("HVHF" or "hydro fracking")[5] to develop the Marcellus Shale and other low-permeability gas reservoirs.[6]  According to the DEC, the Marcellus Shale is a shale formation extending deep underground from Ohio and West Virginia northeast into Pennsylvania and southern New York.  It is as deep as 7,000 feet or more below ground in some areas.  See N.Y.S. Dep't of Envtl. Conservation, Marcellus Shale (2012), available at http://www.dec.ny.gov/energy/46288.html.  Geologists estimate that it may contain up to 489 trillion cubic feet of natural gas.[7]  Id.  Although the gas potential in the Marcellus Shale is not a new discovery, drilling companies abstained from exploration and extraction because of the difficulty and expense associated with drilling such a deep formation.  However, recent advancements in technology and the use of HVHF prompted drilling companies to reconsider opportunities in the Marcellus Shale.

---

[4]  The DEC's website states that horizontal drilling has been used in New York since the 1980s.  "A 'horizontal well' is first drilled down vertically to a depth above the target gas-bearing rock formation.  Special tools are then used to curve the well so that the hole is drilled horizontally within the gas-bearing rock for up to several thousand feet. . . . Except for special tools used underground, horizontal drilling is performed using the same equipment and technology as vertical drilling, with the same protocols in place for aquifer protection, fluid containment and waste handling."  N.Y.S. Dep't of Envtl. Conservation, Marcellus Shale (2012), available at http://www.dec.ny.gov/energy/46288.html.

[5]  HVHF is an unconventional drilling technology which involves the injection of more than a million gallons of water, sand, and chemicals at high pressure down and across into horizontally drilled wells as far as 10,000 feet below the surface.  The pressurized mixture causes the rock layer, in this case the Marcellus Shale, to crack.  The cracks in the rock are then held open by the sand particles, allowing more gas to flow into the well than would naturally.  See id.

[6]  Historically, the highest natural gas producing geologic formations in New York State have been the Trenton Black River, Medina, Herkimer, and Queenston formations.  See N.Y.S. Dep't of Envtl. Conservation Ann. Rep. 2009, New York State Oil, Gas, and Mineral Resources at 14, available at http://www.dec.ny.gov/docs/materials_minerals_pdf/09anrpt1.pdf ("2009 DEC Annual Report").

[7]  To put this in perspective, New York State uses approximately 1.1 trillion cubic feet of natural gas a year.  Id.

- 5 -

As a result of the interest in horizontal drilling combined with HVHF, and the unknown environmental impact caused by it, on July 23, 2008, Governor David Paterson directed the DEC to update its 1992 GEIS covering oil and gas drilling. See N.Y. Envtl. Conserv. Law—Oil and Gas Wells, L. 2008 ch. 376, 2008 N.Y. Sess. Laws 1658–59 (McKinney) ("Directive"). He directed the DEC's update "to address potential new environmental impacts from drilling, including horizontal drilling in Marcellus shale formations." Id. Important concerns included "potential impacts on groundwater resources, procedures for the treatment and transport of process water contaminated during drilling operations, potential impacts on local infrastructure from increased heavy truck traffic, the safety of fluids used in the hydraulic fracturing of geologic formations and potential cumulative impacts of wide-scale drilling." Id.

Accordingly, the DEC commenced the development of a SGEIS. That process is still ongoing. The most recent revised draft SGEIS was released on September 7, 2011, with the period for public comment ending on January 11, 2012. According to the DEC, no permit applications to drill horizontal wells utilizing HVHF in the Marcellus Shale are being processed pending completion of the SGEIS or preparation of a site-specific EIS. Any site-specific review must take into account the same issues being considered in the SGEIS and must be consistent with the requirements of SEQRA and the Environmental Conservation Law.

According to defendants, the Directive constitutes a moratorium which has effectively brought natural gas development in New York State to a screeching halt. According to plaintiffs, defendants may, and have acquired permits to drill utilizing the conventional drilling

methods contemplated by the 1992 GEIS.  For example, in 2009 there were sixteen vertical Marcellus wells producing in New York State.  <u>See</u> 2009 DEC Annual Report at 5.

## B.  The Instant Leases

Plaintiffs are a group of landowners who reside in New York State throughout Broome and Tioga counties.  Between 2000 and 2006, the plaintiffs each[8] entered into separate oil and gas leases with either Central Appalachian Petroleum ("CAP"); Phillips Production Company ("Phillips"); Fortuna Energy, Inc. ("Fortuna"); or Fairman Drilling Company ("Fairman") (collectively the "leases").  Plaintiffs each leased to CAP, Phillips, Fortuna, or Fairman all oil, gas, and constituents underlying their property, and the rights necessary to develop, produce, measure, and market them.

The leases were eventually acquired by defendant Chesapeake.  Chesapeake later assigned 32.5% of its interests to defendant Statoil.

### 1.  CAP Lease

The one CAP lease at issue was executed by plaintiffs Robert and Cheryl Kuzel on June 5, 2000, for a ten year primary term.  <u>See</u> Am. Compl., Ex. B.  The Leasing Clause describes what the Kuzels leased to defendants.  It reads:

> Lessor hereby leases exclusively to Lessee all the oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the land herein leased together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce and market production from the Leasehold, and from adjoining lands, using methods and techniques which are not restricted to current technology, including the right to conduct geophysical and other exploratory tests . . . ."

The Lease Term, also known as the habendum clause, provides:

---

[8]  Some of the leases were entered into jointly by husband and wife, while others were entered into individually.

This lease shall remain in force for a primary term of ten years from June 5, 2000 and for so long thereafter as prescribed payments are made, or for as long thereafter as operations are conducted on the Leasehold in search of or production of oil, gas or their constituents or for as long as a well capable of production is located on the Leasehold, or for as long as extended by provision herein, or for as long as the Leasehold is used for the underground storage of gas, or for the protection of stored gas.

This provision, like many modern habendum clauses, provides that the interest conveyed by the lease exists for a prescribed term of years (here, ten), "and for so long thereafter" as a specified product such as oil or gas is obtained from the land in paying quantities, or some other specified activity continues.  See Wiser v. Enervest Operating, LLC, 803 F. Supp. 2d 109, 118 (N.D.N.Y. 2011) (Peebles, M.J.).  Habendum clauses "establish a definite (or primary) term in which the lessee [is] permitted to develop the property, with an option for an indefinite secondary term permitting the lessee to reap the long-term value and return on the money spent developing the property during the primary term."  Id. (internal quotations omitted).

The CAP lease also contains the following Covenants clause:

This lease and its expressed or implied covenants shall not be subject to termination, forfeiture of rights, or damages due to failure to comply with obligations if compliance is prevented by federal, state, or local law, regulation or decree.

The parties agree the Covenants clause is equivalent to a force majeure provision.  A force majeure event is an event beyond the control of the parties which prevents performance under a contract and may excuse non-performance.  See Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902, 519 N.E.2d 295, 296 (N.Y. 1987).

The lease also contains a Delay Rental clause, which provides for lessee to pay lessor $3.00 per acre per year until the commencement of royalty payments (upon oil or gas being

produced and marketed from the land). Delay rental clauses are included in oil and gas leases because of the implied obligation to immediately develop the property or suffer forfeiture. Wiser, 803 F. Supp. 2d at 118. Such clauses "have the effect of relieving the lessee of the duty to develop the property immediately upon entering into the agreement and instead allow lessees, at their option, to avoid termination of the lease in the primary term by making rental payments." Id. The CAP lease provides for royalty payments upon the production and marketing of oil and gas at one eighth of the revenue realized for both oil and gas.[9] Further, a Delay in Marketing provision in the CAP lease states:

> In the event that Lessee does not market producible gas, oil, or their constituents from the Leasehold, Lessee shall continue to pay Delay Rental until such time as marketing is established, and such payment such payment shall maintain this lease in full force and effect to the same extent as payment of Royalty.

In accordance with these provisions, the Kuzels were paid annual delay rentals of $3.00 per acre during the ten year primary term of their lease.

To date, no operations have been conducted upon the CAP leasehold, no wells have been drilled, no gas has been stored or protected, no gas has been produced, and no royalties have been paid. Absent extension, the CAP lease terminated on June 5, 2010.

On May 27, 2010, the Kuzels received a letter from Chesapeake advising that their lease had been extended by reason of payment and force majeure. The basis of the force majeure claim was Governor David Paterson's July 23, 2008, Directive. The extension letter cited to the Covenants clause and was accompanied by a payment in the amount the Kuzels had received as a delay rental. The Kuzels rejected the delay payment and objected to the

---

[9] According to plaintiffs, rural land comparable to theirs and located within the Marcellus Shale formation is currently being leased at a delay rental of up to $5500 per acre, and with royalty payments up to 20%.

lease extension. Following Chesapeake's failed efforts at renegotiating the terms of the CAP lease, it filed a sworn notice and affidavit of extension in the Broome County Clerk's Office, which has created a cloud on the title to the Kuzel's property.

## 2. **Phillips Leases**

Twenty nine Phillips leases were executed by plaintiffs. See e.g., Am. Compl., Ex. J-1. The Phillips leases can be described as two groups, Group A and Group B. The Group A leases were executed in 2000, for either a ten year primary term or a five year term with a five year extension. The following plaintiffs entered into Group A leases: the Aukemas, the Barnharts, the Burchells, Douglas Greene, the Cooks, Daniel and Mary Hibbard, Herbert Hibbard, the Hiemstras, John and Susie Hricik, Stella Hricik, Gary Lee, Mary Lee, the Maslins, the Mauceris, Nancy Newby, the Rutkowskis, the Schaefers, the Smiths, and the Sweeneys. The Group B leases were executed during 2003 or 2006, for a five year primary term. The Group B plaintiffs include: Orrin Pendell, the Jakubowkis, the Keeslers, Joseph and Doreen Kellicut, Michael and Joseph Kellicut, Charles and Susan Lee, and the Williams.

The Phillips leases state the contracts are

for the sole and only purpose of testing, drilling and operating for oil and gas and of storing in any underlying strata therein by any means and withdrawing therefrom by any means oil or gas produced from the same or other lands, with the exclusive right to operate the same for the term of [ ] years, and as long thereafter as oil or gas is produced, stored in, or withdrawn therefrom by any means, or operations for oil or gas of the storage thereof are being conducted . . . or at anytime thereafter oil or gas is being produced, stored in, or withdrawn therefrom or operations are being conducted thereon for said purposes and to complete the same . . . .

The Phillips leases contain the following express force majeure clause:

In the event lessee is rendered unable in whole or in part, by a force majeure to carry out its obligations under this lease, other than to make payments of amounts due hereunder, its obligations so far as they are affected by such

force majeure shall be suspended during the continuance of an inability so cause. The term 'force majeure' as used herein shall be Acts of God, strikes, lockouts, or other industrial disturbances, acts of the public enemy, wars, blockades, riots, epidemics, lightning, earthquakes, explosions, accidents or repairs to machinery or pipes, delays of carriers, inability to obtain materials or rights of way on reasonable terms, acts of public authorities, or any other causes, whether or not of the same kind as enumerated herein, not within the control of the lessee and which by the exercise of due diligence lessee is unable to overcome.[10]

To date, no oil or gas has been produced from the Phillips leaseholds, none has been stored upon, or withdrawn from the premises, no operations have been conducted, and no royalties have been paid to plaintiffs. Absent extension, all of the Phillips leases have expired. Many of the Phillips plaintiffs received letters from Chesapeake advising that their leases had been extended by reason of the force majeure clauses. Similar to the Kuzels' letter described above, defendants' letters stated that the Directive constituted a de facto moratorium on the processing of all permit applications for the Marcellus Shale. Chesapeake later filed sworn notices and affidavits of extension for many, but not all, of the Phillips leaseholds in the respective county clerk's offices.

### 3. **Fortuna Lease**

The one Fortuna lease at issue was executed by plaintiff Gail Fisher on April 17, 2006, for a five year primary term. <u>See</u> Am. Compl., Ex. N. The Leasing Clause, which describes what Fisher leased to defendants, provides:

Lessor hereby grants and leases exclusively to Lessee all oil and gas and their constituents, whether hydrocarbon or non-hydrocarbon, underlying the Leasehold, together with such exclusive rights as may be necessary or convenient for Lessee, at its election, to explore for, develop, produce, measure and market production from the Leasehold, using methods and techniques

---

[10] The Phillips leases also contain a Delay Rental clause and provide for royalty payments.

which are not restricted to current technology, including the exclusive right to conduct geophysical and other exploratory tests.

The relevant portion of the Lease Term, or habendum clause, provides:

This Lease shall remain in force for a primary term of Five (5) Years from April 11, 2006 (the "Primary Term"), and for so long thereafter as any of the following occur:  (i) a well capable of producing oil and/or gas is located on the lands . . . ; (ii) Lessor is receiving Royalty payments or Shut-In Royalty payments pursuant to the terms of this Lease . . . or (iii) Operations, as hereinafter defined, are being conducted on lands . . . provided that such Operations result in a well capable of producing oil and/or gas . . . .

The Fortuna lease also contains an express force majeure clause, but defendants do not argue this provision extended the lease.[11]

To date, no oil or gas wells have been located upon the Fortuna leasehold, Fisher has not received royalty payments, and no operations have been conducted upon the premises. Absent extension, the Fortuna lease expired on April 17, 2011.  On March 1, 2011, Fisher received a letter from Chesapeake advising that her lease had been extended by reason of force majeure.

### 4. Fairman Lease

The one Fairman lease at issue was executed by plaintiffs Scott and Connie Bodine on May 15, 2001, for a ten year primary term.  See Am. Compl., Ex. Q.  The Leasing Clause, which describes what the Bodines leased to defendants, provides:

[T]he LESSOR . . . does hereby lease and let the exclusive right necessary, convenient and incident to LESSEE for the purpose of exploring, drilling, and operating for producing and taking possession of the oil and natural gas . . . and all other products associated with the production therewith . . . .

The habendum clause in the Fairman lease provides:

---

[11]  The Fortuna lease also contains a Delay Rental clause and provides for royalty payments.

It is agreed that this lease shall remain in force for the term of ten years hereinafter referred to as "primary term", from date hereof and so long thereafter as the said land or any portion thereof is pooled, unitized or consolidated therewith as provided for hereinafter, while being operated by LESSEE in the search for or production of said product or as long as gas is being stored, held in storage, or withdrawn from the premises by the LESSEE.

The Fairman lease does not contain an express force majeure clause.[12]

To date, the Fairman leasehold has not been pooled, unitized, or consolidated, and no gas has been withdrawn from the premises. No oil or gas wells have been located upon the premises and no gas is being stored on the premises. Absent extension, the Fairman lease expired on May 15, 2011. By letter dated April 8, 2011, Chesapeake advised the Bodines that their lease was extended by reason of payment and force majeure. The Bodines rejected defendants' payment and objected to the lease extension. Defendants thereafter filed a sworn notice and affidavit of extension in the Tioga County Clerk's Office.

## III.  DISCUSSION

### A.  Motion to Strike

Defendants move to strike the portions of the Keefe reply affidavit submitted by plaintiffs in opposition to defendants' cross-motion for summary judgment. Defendants assert the Keefe affidavit improperly sets forth legal arguments and conclusions. Specifically, they contend the following statements must be stricken:  (1) Paragraph 2 in its entirety; (2) paragraph 3 in its entirety; (3) the last two sentences in paragraph 5; and (4) the last sentence in paragraph 6. Plaintiffs oppose and contend Keefe may assert statements of fact based upon his own experience, training, and knowledge of the industry.

---

[12] The Fairman lease also contains a Delay Rental clause and provides for royalty payments.

Affidavits must be made based "on personal knowledge, set out facts that would be admissible in evidence and show that the affiant . . . is competent to testify on matters stated." Fed. R. Civ. P. 56(c)(4). Moreover, Rule 7.1(a)(2) of the Local Rules of Practice for the Northern District of New York provides that "[a]n affidavit must not contain legal arguments but must contain factual and procedural background that is relevant to the motion the affidavit supports." Courts may strike portions of an affidavit that are not based on the affiant's personal knowledge, are inadmissible, or make conclusory statements. Hollander v. Am. Cyanamid Co., 172 F.3d 192, 198 (2d Cir. 1999). However, such relief is often unnecessary as courts are able to distinguish between proper and improper submissions. See Martin v. Town of Westport, 558 F. Supp. 2d 228, 231 (D. Conn. 2008) ("Defendants should have faith, however, that the court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving [testimony] of a particular party.").

Any inappropriate portions of Keefe's affidavit will be disregarded, and only admissible evidence will be relied upon in considering the summary judgment motions. Defendants' motion to strike will be denied.

**B.  Motions for Summary Judgment**

Summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509–10 (1986). All facts, inferences, and ambiguities must be viewed in a light most

- 14 -

favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986).

Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  Fed. R. Civ. P. 56; <u>Liberty Lobby, Inc.</u>, 477 U.S. at 250, 106 S. Ct. at 2511.  A fact is "material" if it "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248, 106 S. Ct. at 2510; <u>see also</u> <u>Jeffreys v. City of N.Y.</u>, 426 F.3d 549, 553 (2d Cir. 2005).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586, 106 S. Ct. at 1356.  There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.  <u>Liberty Lobby, Inc.</u>, 477 U.S. at 248–49, 106 S. Ct. at 2510; <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587, 106 S. Ct. at 1356.

With respect to matters of contract interpretation, the intention of the parties control. <u>SR Int'l Bus. Ins. Co. v. World Ctr. Props., LLC</u>, 467 F.3d 107, 125 (2d Cir. 2006).  "[T]he best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face[, i]t must be enforced according to the plain meaning of its terms.'" <u>Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust</u>, 375 F.3d 168, 177 (2d Cir. 2004) (quoting <u>Greenfield v. Philles Records, Inc.</u>, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002)).  In the event of an ambiguity, a contract will be construed against its drafter since the drafter is responsible for any ambiguity.  <u>M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.</u>, 432 F.3d 127, 142 (2d Cir. 2005).[13]

---

[13] For a more elaborate discussion of contract principles as they relate to oil and gas leases, see Magistrate Judge Peeble's discussion in <u>Wiser</u>, 803 F. Supp. 2d at 116–118.

## C. Force Majeure

The lease terms here provide that the leases expire at the conclusion of the primary terms if the land has not been operated by the lessee in the production of oil or gas. It is plaintiffs' burden on summary judgment to show that defendants did nothing to propel the leases into the secondary terms. It is undisputed that no operations have been conducted upon the leaseholds, no wells have been drilled, no gas has been stored or protected, no gas has been produced, and no royalties have been paid. Thus, the primary terms of the subject leases expired when the five or ten year mark hit and defendants failed to conduct any activities upon the leased premises. For purposes of this analysis, plaintiffs have established that the leases terminated.

Defendants argue the Directive qualifies as a force majeure event which extends the leases. They assert the Directive prevented them from fulfilling their obligations under the leases because it is a state regulation which bans the only viable method (horizontal drilling and HVHF) to develop the only viable formation (the Marcellus Shale) in Broome and Tioga Counties. Further, although they claim the leases are all extended by common law force majeure, defendants argue the CAP and Phillips leases are also extended under express lease language. They argue the force majeure language was triggered during the primary terms by the Directive, thus modifying the lease durations as set forth in the habendum clauses.

Plaintiffs argue common law force majeure does not extend the leases because it is a narrow doctrine, only excusing a party's performance when the subject matter of the contract has been destroyed or the means of performance of the contract is impossible. Because permits are still available for traditional drilling methods, they contend defendants'

performance is not impossible. They also assert that intervening governmental activities such as the Directive may only render performance impossible if they are unforeseeable. Plaintiffs contend it was foreseeable that the utilization of HVHF would require additional environmental review. With respect to the CAP and Phillips leases, plaintiffs argue the express majeure clauses have not been triggered because the claimed force majeure event—the non-issuance of HVHF permits—is not enumerated in the subject clauses.

Defendants contend the Directive precludes any and all good faith development of the leaseholds. They assert they are bound by the duty of good faith to prudently develop the leaseholds, and performance is objectively impossible and would be in bad faith where the only option is to drill unproductive formations or use knowingly ineffective methods. Chesapeake asserts that it and other operators drilled vertical wells in an attempt to develop the Marcellus Shale and were unsuccessful, despite using in excess of 80,000 gallons of water to fracture the wells. Chesapeake also attempted to develop non-shale formations in the vicinity of the leaseholds with no success. They assert that the inability to extract and develop in a commercially practicably manner equates to a deprivation of the entire property interest, which has the same effect as destroying the subject matter of the contract.

The primary purpose of force majeure is to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd., 782 F.2d 314, 319 (2d Cir. 1985). As the party invoking the doctrine, defendants carry the burden to establish force majeure. Id. Under force majeure, "[m]ere impracticality or unanticipated difficulty is not enough to excuse performance." Phibro Energy, Inc. v. Empresa de Polimeros de Sines Sarl, 720 F. Supp. 312, 318 (S.D.N.Y. 1989). Finally, "a

force majeure clause must include the specific event that is claimed to have prevented performance." Id. (citing Kel Kim Corp., 70 N.Y.2d at 902–03, 519 N.E.2d at 296).

Common law force majeure nor the express force majeure clauses here extend the leases.  Even if the Directive constituted a force majeure event factually, it did not prevent defendants from performing under the terms of the leases.  Plaintiffs leased to defendants access to the premises for a set period of time and granted defendants the right to explore for natural gas and oil.  In the event defendants discovered gas or oil during the primary terms and subsequently drilled, producing marketable gas or oil, defendants were obligated to tender royalty payments to plaintiffs.  As defendants did not have an obligation to drill, the invocation of force majeure to relieve them from their contractual duties is unnecessary.

Moreover, the Directive does not frustrate the purpose of the leases.  The purpose of the leases is to explore, drill, produce, and otherwise operate for oil and gas and their constituents.  Defendants may still explore, drill, produce, and otherwise operate for oil and gas and their constituents.  The Directive put a halt on horizontal drilling using HVHF; drilling permits for conventional drilling methods have, and continue to be, issued in the area of plaintiffs' lands.  The only thing defendants were unable to do during the primary terms was to horizontally drill using HVHF.  The leases do not limit defendants' right to drill to a specific type of drilling nor a particular formation.  While defendants submit evidence demonstrating that horizontal drilling combined with HVHF is the only commercially viable method of production in the Marcellus Shale and drilling using conventional methods is impractical, "[m]ere impracticality . . . is not enough to excuse performance."  Phibro Energy, 720 F. Supp. at 318.  Defendants did not contract for guaranteed production of oil and gas; they contracted for access, exploration, and the right to drill for a set period of time.

As the drafters of the leases, defendants were in the best position to impose drilling specifications as to the methods used or formations explored. The parties acknowledge that the oil and gas industry is a speculative business; plaintiffs did not guarantee production nor that defendants would profit, and defendants did not guarantee production nor that plaintiffs would receive royalties. Had defendants changed their minds during the primary term—for example, had they determined that the leaseholds were no longer commercially viable and accordingly chose not to drill—they would have been free to continue making delay rental payments and let the leases expire by their primary terms.

Accordingly, force majeure whether common law or express, does not extend the leases.

### D. <u>Frustration of Purpose</u>

In addition to relying on force majeure, defendants argue the leases should be extended based on the doctrine of frustration of purpose. They contend the Directive and resulting moratorium wholly frustrate the primary purpose of the leases.

The defense of frustration of purpose "focuses on events which materially affect the consideration received by one party for his performance. Both parties can perform, but as a result of unforeseeable events, performance by party X would no longer give party Y what induced him to make the bargain in the first place." <u>United States v. Gen. Douglas MacArthur Senior Vill., Inc.,</u> 508 F.2d 377, 381 (2d Cir. 1974). The doctrine excuses performance when a "virtually cataclysmic, <u>wholly unforeseeable event</u> renders the contract valueless to one party." <u>Id</u>. (emphasis added).

The Directive was foreseeable. The 1992 GEIS was the governing regulation in effect when the leases were signed, renewed, and assigned. That statement contemplated

conventional gas well fracturing using 20,000 to 80,000 gallons of fluid. HVHF involves the injection of more than a million gallons of water, sand, and chemicals. It is clear that the 1992 GEIS failed to adequately consider the environmental impacts posed by HVHF. The 1992 GEIS is clear that drilling utilizing more than 80,000 gallons of liquid would not be permitted without conducting an SGEIS or performing a site-specific EIS. Therefore, it was foreseeable that a non-conventional drilling method such as HVHF would require additional environmental review.

Defendants cannot rely on the doctrine of frustration of purpose to extend the leases.

**E. Delay Rental Payments**

According to defendants, the CAP lease remains in effect because it was extended under the "prescribed payments" alternative of the habendum clause by the continued tender of rental payments beyond the primary term. That provision provides in part: "This lease shall remain in force for a primary term of ten years from June 5, 2000 and for so long thereafter as prescribed payments are made . . . ." Compl., Ex. B. They contend payment of delay rentals alone propels the CAP lease into the secondary term. Plaintiffs counter that the purpose of the Delay Rental clause is to permit the lessee to maintain the lease during the primary term, without having to immediately commence development, and that payment of delay rentals cannot serve to extend the primary term of a lease.

The parties cite authority from other circuits regarding whether the payment of delay rentals can extend the primary term of a lease. While none is controlling law, the reasoning provided in Hite v. Falcon Partners, 13 A.3d 942, 946–48 (Pa. Super. Ct. 2011), and cited by Magistrate Judge Peebles in Wiser, 803 F. Supp. 2d at 120, is persuasive. The Hite Court explained that delay rental clauses came into use because courts began to imply an

obligation upon an operator to immediately develop the leasehold or suffer forfeiture.  Hite, 13 A.3d at 946–48.  As a state trial court in the Southern Tier recently noted, "[s]uch advance minimum payments are in the nature of liquidated damages for the lessee's decision to forego production and are viewed as the consideration paid to the landowner in lieu of the royalty that would be paid if production operations were to be undertaken immediately." Burlew v. Talisman Energy USA Inc., 35 Misc. 3d 799, 805–06, 940 N.Y.S.2d 781, 787 (N.Y. Sup. Ct. Allegheny Cnty. 2011) (internal quotations omitted).  Delay rental payments negate the implied covenant to immediately develop; they do not serve to extend the primary term. Defendants' arguments and case law to the contrary have been considered and are rejected.

The prescribed payments language in the habendum clause does not extend the CAP lease.

### F.  Pendell Lease[14]

According to plaintiffs, there is no dispute that defendants did not attempt to extend plaintiff Orrin Pendell's lease, and thus summary judgment should be granted as to his claim and a release ordered as to his lease.  Defendants do not respond to this argument.  There is no need to determine whether his lease required notice because the Phillips leases have all expired at the conclusion of the primary terms for the reasons explained above.

Therefore, plaintiffs' motion for summary judgment on this basis is moot.

### G.  New York General Business Law Claim

Defendants move for summary judgment dismissing this claim.  They contend their good faith assertion of their contractual and common law rights (via the extension letters and

---

[14]  This is a Phillips lease (Group B).

sworn affidavits) in the face of no controlling New York law is not, and cannot be a fraudulent practice in violation of section 349 of the General Business Law. Plaintiffs contend this request is premature because the parties agreed to forgo discovery on this cause of action pending resolution of the contractual issues, and in any event, the Chesapeake employees' self-serving representations that they acted in good faith are insufficient to prevail on summary judgment.

Section 349 of the New York General Business Law is a consumer protection statute. See Stadt v. Fox News Network LLC, 719 F. Supp. 2d 312, 319 (S.D.N.Y. 2010). It provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are . . . unlawful." N.Y. Gen. Bus. Law § 349(a). To assert a claim under section 349, a plaintiff must allege "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." Stadt, 719 F. Supp. 2d at 319 (quoting Maurizio v. Goldsmith, 230 F.3d 518, 521 (2d Cir. 2000)). "[T]he gravamen of the complaint must be consumer injury or harm to the public interest." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir. 1995).

Plaintiffs have not offered any factual or legal basis to oppose defendants' motion for summary judgment. Defendants' motion will be granted and this claim will be dismissed.

## IV. CONCLUSION

The leases terminated at the conclusion of their primary terms, and defendants cannot invoke force majeure, the doctrine of frustration of purpose, nor the prescribed payments clause to extend the leases. Therefore, plaintiffs' motion for partial summary judgment will be granted and defendants' cross-motion for summary judgment on these bases will be

denied, and the counterclaims will be dismissed.  Finally, plaintiffs' cause of action under section 349 of the New York General Business Law will be dismissed.  All of the parties' remaining arguments have been considered and are without merit.

Therefore, it is

ORDERED that

1.  Defendants' motion to strike David W. Keefe's affidavit is DENIED;

2.  Plaintiffs' motion for partial summary judgment is GRANTED;

3.  All of the leases are declared expired by their terms;

4.  Defendants' cross-motion for summary judgment is GRANTED as to plaintiffs' Deceptive Business Practices claim pursuant to New York General Business Law section 349 and that claim is DISMISSED;

5.  Defendants' cross-motion for summary judgment is DENIED as to plaintiffs' remaining claims;

6.  Defendants' counterclaims are DISMISSED; and

7.  Pursuant to New York General Obligations Law section 15–304, the judgment in this case shall be considered "a document in recordable form cancelling the leases as of record in the county where the leased land[s are] situated" and may be filed in the appropriate court and/or county clerk's office.

The Clerk is directed to file a judgment in accordance with this Memorandum-Decision and Order.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  November 15, 2012
        Utica, New York.